GRIFFIN, Circuit Judge,
concurring in part and dissenting in part.
I concur in the result regarding plaintiff William B. Rase. However, I respectfully dissent as to the other plaintiffs (“plaintiffs”). On this significant tax question for which “[ujniformity among the circuits is especially important in tax cases to ensure equal and certain administration of the tax system,” Nickell v. Comm’r, 831 F.2d 1265, 1270 (6th Cir.1987), I would follow the persuasive authority of North Dakota State University v. United States, 255 F.3d 599 (8th Cir.2001). In doing so, I would hold that the payments at issue, with the exception of the payments to plaintiff William Rase, do not constitute “wages” for purposes of the Federal Insurance Contributions Act (“FICA”), I.R.C. §§ 3101-3128. Accordingly, I would affirm the grant of summary judgment in favor of plaintiffs in Klender and reverse the grant of summary judgment in favor of the United States in Appoloni.
I.
Both cases are certified class actions encompassing former employees of Michigan school districts and public post-secondary educational institutions residing in the Western (Appoloni) and Eastern {Klender) Districts of Michigan who received early retirement incentive payments from their employers and unsuccessfully applied to the Internal Revenue Service (“IRS”) for refunds of FICA taxes withheld on such payments during the previous two years. The facts in each of the cases are not in dispute. Because key facts affect my disagreement with the majority’s analysis and conclusion, I will briefly recite the facts crucial to my resolution.

A. Appoloni v. United States

The representative plaintiffs, Donald Appoloni, William Bergemann, and Sandra Engle, are former public school teachers in the Dowagiac Union School District (“Dowagiac”) who possessed tenure rights pursuant to the Michigan Teachers’ Tenure Act (the “Tenure Act”), Mich. Comp. Laws §§ 38.71 to 38.191. A public school teacher obtains tenure after satisfactorily completing a four-year (formerly two-year) probationary period of employment, Mich. Comp. Laws § 38.81, and thereafter may be discharged or demoted only “for reasonable and just cause and only as provided in [the Tenure Act],” Mich. Comp. Laws § 38.101. Tenure status also entitles a teacher to a shorter probationary period in any other Michigan school district. Mich. Comp. Laws § 38.92. Appoloni obtained tenure in 1990, Bergemann obtained ten *197 ure in 1970, and Engle obtained tenure in 1975.
Appoloni, Bergemann, and Engle all opted to participate in the Employee Severance Plan (“ESP”). The plan is described by plaintiffs as follows:
Under the plan, teachers who (a) had at least ten years’ service with the School District, and (b) were at the highest step of the applicable pay scale, were eligible to elect to participate in the plan by indicating their intent during a window period from November 13, 2000 to January 9, 2001.... The plan provided that if more than 30 eligible teachers applied, participation would be determined on the basis of seniority, and that if fewer than 15 applied the plan would be can-celled. Id.
Participants in the buyout plan were required to resign from employment with the School District as of June 30, 2001, to “waive ... all future employment rights, all entitlement to future wage and benefits increases, all rights to participate in any district-sponsored benefit plans,” and to “agree not to apply for reemployment” without the School District’s consent.... In consideration for giving up these rights to future employment, participating teachers were to receive the equivalent of their 1999-2000 annual base salary (but no more than $53,021), in 60 monthly payments over a five-year period. Teachers’ participation in the buy-out plan was entirely voluntary.

B. Klender v. United States

The material facts of Klender are substantially similar to the facts of Appoloni. Plaintiffs Phyllis Klender and Roger Petri were both employed by the Pinconning Area School District (“Pineonning”), although they retired at slightly different times and therefore participated in different severance plans. Plaintiff William Rase was employed by the West Branch-Rose City Area School District (“West Branch-Rose”). The features of the applicable severance plans are outlined below.

1. Phyllis Klender

Like Dowagiac, Pinconning also created an Employee Severance Plan (“ESP”) designed to induce long-term employees to leave their jobs. The plan was available to teachers who had twenty or more years of service with Pinconning as of June 30, 2000. All teachers who accepted the ESP were paid the same amount: $46,800 if retired by June 30, 2000; and $43,200 if retired by June 30, 2001. The uniform ESP payment amount was arbitrary in the sense that it bore no relationship to an individual teacher’s loss of actual wages. The Pinconning employees also agreed to give up all future employment rights, including “any and all claims existing in equity or law under federal and state law or board policy pertaining to any right to reappointment or tenure rights by virtue of any expressed agreements or oral understandings.” The employees further relinquished any right to bring suit against the school district under “Title VII of the U.S. Civil Rights Act of 1964 or any other statute, constitutional provision or common law theory related to employment, employment discrimination or his/her separation from employment” and under the “Age Discrimination in Employment Act of 1967 and the Older Workers Protection Act of 1990.”
Phyllis Klender, a tenured teacher eligible for the plan, agreed to participate and retired effective June 30, 2000, after signing the requisite releases. After Pincon-ning deducted FICA taxes from subsequent severance plan payments distributed to Klender, Klender timely filed a claim for a refund with the IRS. On January 23, *198 2002, the IRS denied Blender’s claim for a refund.

2. Roger Petri

Pineonning offered Roger Petri a similar plan in 1996. All teachers with a minimum service of ten years were eligible to receive the uniform sum of $37,500, irrespective of an individual’s loss of actual wages. Like Klender’s plan, Petri’s ESP plan required him to relinquish rights to continued employment. Although the 1996 agreement did not specifically list tenure rights, participating employees agreed
to fully and completely waive, discharge, release and hold Pinconning Area Schools and the Pinconning Area Education Association harmless ... from any and all liability, claims, charges, demands and/or causes of action of any kind whatsoever ... including, but not limited to, claims for breach of contract, deprivation of constitutional rights, claims of wrongful discharge and/or claims of discrimination....
The agreement further “acknowledge^ that the Program benefit constitutes compensation which the Teacher would not otherwise be entitled to.”
Having obtained tenure in 1973, Roger Petri qualified for the severance program and, accordingly, accepted the buy-out offer, which included the release document, in February of 1997. As with Klender, Pinconning deducted FICA taxes from the ESP payments Petri received. On August 29, 2001, Petri filed a claim for a refund with the IRS for FICA taxes withheld on the payments he received, and, on October 23, 2001, the IRS denied Petri’s claim for a refund.

3. William Rase

William Rase worked in the West Branch-Rose School District. Like the other districts, West Branch-Rose devised a plan to give qualified teachers a fixed sum in exchange for the teachers’ agreement to retire early. The West Branch-Rose plan differed, however, because it was included in the “Master Agreement;” that is, the contract between the school district and the chapter of the teacher’s union that represented the district’s teachers, including Rase. The actual sum an employee received was dependent upon the number of years the teacher was involved in a Michigan public employees’ retirement plan and varied between $10,000 and $30,000. Unlike the other ESPs, there was no admissible evidence presented that the teachers who chose to participate in the early retirement plan were contractually required to release statutory rights to receive the severance payments. Nevertheless, Rase claims, by way of affidavit, that the payments were contingent upon the relinquishment of his tenure rights in exchange for the ESP payments. Rase qualified for the early retirement plan because he was employed by West Branch-Rose as a teacher since 1979 and achieved tenure in 1981. After Rase committed to the plan in early 2001, West Branch-Rose subsequently deducted FICA taxes from the payments to Rase. Like the other plaintiffs, Rase unsuccessfully filed a claim for a refund with the IRS.
I concur in the result reached by the majority with respect to William Rase. I would hold that the claim by Rase fails when confronted by the government’s motion for summary judgment because there was no obligation by Rase to relinquish his statutory tenure rights. Although Rase proffered his subjective opinion, by affidavit, that the payment was contingent upon his relinquishment of claims pursuant to the Michigan Tenure Act, no factual evidence supports this eonclusory assertion. fed. R. Crv. P. 56(e). Accordingly, I concur *199 with the majority that Rase’s ESP payments were subject to FICA taxes.
II.
These cases present an issue of statutory construction. In this regard, the inquiry begins with the fundamental purpose of judicial construction of statutes, which is to ascertain and give effect to the original meaning of the words used by Congress:
[W]e begin with the understanding that Congress “says in a statute what it means and means in a statute what it says there,” Connecticut Nat. Bank v. Germain, 503 U.S. 249, 254, 112 S.Ct. 1146, 117 L.Ed.2d 391 (1992). As we have previously noted in construing another provision of § 506, when “the statute’s language is plain, ‘the sole function of the courts’ ” — at least where the disposition required by the text is not absurd — “ ‘is to enforce it according to its terms.’ ” United States v. Ron Pair Enterprises, Inc., 489 U.S. 235, 241, 109 S.Ct. 1026, 103 L.Ed.2d 290 (1989) (quoting Caminetti v. United States, 242 U.S. 470, 485, 37 S.Ct. 192, 61 L.Ed. 442 (1917)).
Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A., 530 U.S. 1, 6, 120 S.Ct. 1942, 147 L.Ed.2d 1 (2000).
As Justice Scalia has further elaborated: The text is the law, and it is the text that must be observed. I agree with Justice Holmes’s remark, quoted approvingly by Justice Frankfurter in his article on the construction of statutes: “Only a day or two ago — when counsel talked of the intention of a legislature, I was indiscreet enough to say I don’t care what their intention was. I only want to know what the words mean.”[28] And I agree with Holmes’s other remark, quoted approvingly by Justice Jackson: “We do not inquire what the legislature meant; we ask only what the statute means.”[29]
Antonin Scalia, A MatteR Of Interpretation: Federal Courts And The Law 22-23 (1997).
The FICA defines “wages” as “all remuneration for employment, including the cash value of all remuneration (including benefits) paid in any medium other than cash_” 26 U.S.C. § 3121(a) (emphasis added). “Employment” is further defined as “any service, of whatever nature, performed ... by an employee for the person employing him....” Id. at § 3121(b) (emphasis added). Thus, the statute’s plain language raises the issue of whether the plaintiffs received their ESP remuneration for “any service” performed by them for their employer.
Where, as here, no statutory definitions exist, courts may refer to dictionary definitions for guidance in discerning the plain meaning of a statute’s language. United States v. Edward Rose & Sons, 384 F.3d 258, 263 (6th Cir.2004); Cleveland v. City of L.A., 420 F.3d 981, 989 (9th Cir.2005); see MCI Telecomm. Corp. v. Am. Tel. & Tel. Co., 512 U.S. 218, 225-29, 114 S.Ct. 2223, 129 L.Ed.2d 182 (1994) (using dictionary definitions to interpret the word “modify”).
The ordinary, common meaning of the word “services” is “[a]n act or a variety of work done for others, especially for pay.” Amerioan Heritage Dictionary Of The English Language 222 (4th ed.2000). Other major English language dictionaries are to the same effect:
*200 “An act of serving; a duty or piece of work done for a master or superior. OxfoRD English Dictionary, http:// www.oed. com (enter term “service”)”; “the work performed by one that serves <good service> b: useful labor that does not produce a tangible commodity - usually used in plural < charge for professional services >[,] Merriam-Webster Online Dictionary, http://www.m-w.com (enter term “service”)”; “The performance of work or duties for a superior or as a servant .... 4. a. Work done for others as an occupation or business,” DiCtionary.Com, http://dictionary. reference.com/ (enter term “service”)”.
After my review of these common definitions and Social Security Board v. Nierotko, 327 U.S. 358, 66 S.Ct. 637, 90 L.Ed. 718 (1946), which held that the term “service” is not limited to “productive activity,” but includes compensation for the loss of actual wages, I conclude, consistent with the Eighth Circuit, the United States District Court for the Western District of Pennsylvania, and the United States District Court for the Eastern District of Michigan, that the ESP payments were made in exchange for the relinquishment of plaintiffs’ statutory and constitutionally-protected tenure rights, rather than remuneration for “services” to the school districts. Similar to the payment of meals[1] and lodging in Rowan Companies, Inc. v. United States, 452 U.S. 247, 101 S.Ct. 2288, 68 L.Ed.2d 814 (1981), and the release of tort claim damages in Gerbec v. United States, 164 F.3d 1015, 1026 (6th Cir.1999), the ESP payments, although arising in the employment setting, were not remuneration for “any service” performed by plaintiffs. Rather, the ESP payments were a “clear, separate, and adequate consideration” exchanged for the relinquishment of plaintiffs’ vested and bona fide statutory rights to tenure.
III.
Prior to Rowan, a plausible argument could be made that the term “wages” as used in the FICA should be “broadly construed.” See Nierotko, 327 U.S. at 355-366, 66 S.Ct. 637. Relying on Nierotko and obiter dictum from our decision in Gerbec, 164 F.3d. at 1015 (“ ‘remuneration for employment’ as it appears in [26 U.S.C.] § 3121 should be interpreted broadly”), the majority reaches a result which is largely ordained by its choice of a rule of statutory construction.
In my view, the statute at issue, like all statutes, should not be construed “broadly,” “narrowly,” “strictly,” or “liberally,” but rather fairly and reasonably. In this regard, I agree with Justice Scalia that “[a] text should not be construed strictly, and it should not be construed leniently; it should be construed reasonably, to contain all that it fairly means.” Soalia, A Matter Of Interpretation at 23.
Furthermore, any notion that § 3121 should be interpreted broadly, rather than fairly and reasonably, was rejected by the Supreme Court in Rowan, 452 U.S. at 263, 101 S.Ct. 2288. In Rowan, the government unsuccessfully argued that the holding of Central Illinois should not apply to the term “wages” as contained in the FICA. Id. at 251-52, 101 S.Ct. 2288.[2] The government contended that the definition of “wages” for purposes of the FICA should be given a broader and more ex *201 pansive interpretation. Id. The government’s position was rejected by the Supreme Court, and the treasury regulation at issue was declared invalid. Id. at 263, 101 S.Ct. 2288. The Court summarized its holding as follows:
We conclude that Treas. Reg. §§ 31.3121(a)-l(f) and 31.3306(b)-l(f) fail to implement the statutory definition of “wages” in a consistent or reasonable manner. The plain language and-legislative histories of the relevant Acts indicate that Congress intended its definition to be interpreted in the same manner for FICA and FUTA as for income-tax withholding. The Treasury Regulations on which the Government relies fail to do so, and their inconsistent and unexplained application undermine the contention that Congress nonetheless endorsed them. As Congress did intend a consistent interpretation of its definition, these Treasury Regulations also are inconsistent with the Court’s reasoning in Central Illinois.
We therefore hold that the Regulations are invalid, and that the Service erred in relying upon them to include in the computation of “wages” the value of the meals and lodging that petitioner provided for its own convenience to its employees on offshore oil rigs. The judgment of the Court of Appeals is reversed.

Id.

Although Congress amended 26 U.S.C. § 3121(a)[3] in response to Roivan, thus allowing differing regulatory treatment of “wages” for purposes of income tax withholding and the FICA, the “broad interpretation” of the definition of “wages” for FICA purposes has not been restored.
After construing the statute at issue in a fair and reasonable manner, consistent with the words used by Congress, I would hold that, with the exception of plaintiff William Rase, the ESP payments were made in exchange for the relinquishment of plaintiffs’ statutory and constitutionally protected tenure rights, rather than as remuneration for services to the school districts.[4]
IV.
The weight of authority from the circuits also supports plaintiffs’ position. In Ger-bec, the plaintiffs successfully sued their employer for damages arising from ERISA violations, and a question arose whether the resulting payments were subject to FICA and income taxes. 164 F.3d at 1026. We held that “any damages attributable to wages [plaintiffs] would have received had they not been wrongly terminated should also be subject to the FICA taxes they would have paid on those wages had they not been wrongly terminated.” Id. at 1026-27. Significantly, we also held that the plaintiffs’ tort damages were not subject to FICA taxation. Id. In short, only the portion of the damages that com *202 pensated plaintiffs for the loss of actual wages[5] was taxable pursuant to FICA. Id.
The majority acknowledges this distinction, holding that awards representing a loss in wages that otherwise would have been paid are subject to FICA taxes. Yet there is no question that the severance payments would not have been paid had plaintiffs not relinquished their tenure rights. Were it not for their statutory tenure rights, plaintiffs would be at-will employees, subject to discharge without cause or consideration. See generally Toussaint v. Blue Cross-Blue Shield, 408 Mich. 579, 292 N.W.2d 880 (Mich.1980). Indeed, this is evidenced by similarly situated employees who worked the same number of years and were entitled to the same salary levels as plaintiffs, who did not receive the ESP payments. The ESP payments therefore were not made in exchange for any “service” that plaintiffs performed or were wrongfully prevented from performing, but, rather, in exchange for the relinquishment of a separate statutory right. Accordingly, the majority’s conclusion that any damages arising from a lawsuit following the illegal deprivation of the tenure right would be taxable under Gerbec is not correct.
The uniformity in the amount of the ESP' payments is further evidence that this consideration was not the sum of each individual teacher’s loss of actual wages. The ESP payments are neither tailored, on a case-by-case basis, to the recipient’s employment record nor to the recipient’s current wage rate. Moreover, the ESP payments are not equivalent to each teacher’s loss of earning capacity because the age of each teacher varies considerably. In sum, there is no correlation between the amount of the ESP payments and the teachers’ individual employment circumstances that would lend support to the majority’s theory that the ESP payments constitute discretely earned wages for purposes of income tax withholding and the FICA. As Gerbec holds, remuneration for actual wage loss, past and future, is subject to FICA taxation. However, payment in exchange for the relinquishment of other vested and bona fide claims such as tort and statutory rights are not subject to FICA taxation.
The majority is persuaded that the ESP payments were not made in exchange for the plaintiffs forfeiting their tenure rights by the fact that eligibility to participate in the ESP was conditioned upon a teacher working fór a specific duration. This, the majority concludes, is an important, if not dispositive, factor in determining whether payments “arise” from an employment relationship for purposes of FICA taxation. I agree with the proposition that where an employment contract and past service to the employer constitute the consideration for the payment, such payment is indeed inextricably tied to “services” rendered the employer. However, the present circumstances do not yield a similar conclusion. The majority’s rationale that the ESP payments were made in consideration of the plaintiffs’ past years of service is belied by the fact that similarly situated employees who did not relinquish their tenure rights received nothing. The majority further ignores the critical fact that the rights relinquished by plaintiffs stemmed from the entirely separate grant *203 of authority created by state statute and, thus, required specific relinquishment of statutorily protected tenure rights. For these reasons, I would hold that it was this relinquishment, not the years of service, for which the school districts paid.
In North Dakota, the Eighth Circuit examined a materially indistinguishable set of facts, 255 F.3d at 599.[6] Faced with the presentation of a correspondingly similar issue, the North Dakota court differentiated the tenured faculty from the non-tenured administrators, stating that “the administrators who were not on the academic staff were [not] anything other than at-will employees entitled only to extended notice before termination.” Id. at 608. Accordingly, the non-tenured employees’ severance payments were subject to FICA taxes, because the payments corresponded to the number of years worked rather than the forfeiture of a due process right. Id. While the tenure-qualification process at issue was more rigorous, id. at 606, Michigan law similarly recognizes tenure as a property right and provides procedural safeguards, qualifications, and protections for the tenure rights of public school teachers. See Tomiak v. Hamtramck Sch. Dist., 426 Mich. 678, 397 N.W.2d 770, 780 (Mich.1986); see also Klender, 328 F.Supp.2d at 765-67 (discussing laws that govern the process of tenure in Michigan).
Although North Dakota is not controlling authority in this Circuit, the decision is entitled to considerable deference. See Aeroquip-Vickers, Inc. v. Comm’r, 347 F.3d 173, 181 (6th Cir.2003) (“ ‘Uniformity among the circuits is especially important in tax cases to ensure equal and certain administration of the tax system. We would therefore hesitate to reject the view of another circuit.’ ” (quoting Nickell, 831 F.2d at 1270)).
In addition to North Dakota, the District Court for the Western District of Pennsylvania recently held that early retirement incentive payments made to tenured faculty and administrators at the University of Pittsburgh were not subject to FICA taxes. Univ. of Pittsburgh v. United States, No. 04-1616, 2005 WL 3619245 (W.D.Pa. Oct.18, 2005) (magistrate decision), adopted, November 21, 2005. Analyzing virtually indistinguishable circumstances, the court found the rationale of North Dakota persuasive, holding that: (1) no “service” was rendered in exchange for the payments, thus rendering the payments an exchange for the “relinquishment of protected property rights,” id. at *11-12; and (2) non-tenured faculty members offered the same payments were subject to FICA taxation, as they possessed only an “expectation of continuing employment,” id. at *12.
Finally, in this appeal, the district court opinion in Klender offers a well-reasoned analysis in support of its conclusion that the contested payments are not subject to FICA taxation. Klender, 328 F.Supp.2d at 760-67.
V.
The majority relies on Revenue Rulings to buttress its conclusion that the ESP payments are subject to FICA taxation. However, the Revenue Rulings at issue, which are persuasive authority at best, do not preclude the conclusion that the subject ESP payments are not taxable pursuant to FICA. See Aeroquip-Vickers, Inc., 347 F.3d at 180 (holding that revenue ral- *204 ings are not entitled to Chevron deference (i.e. when a non-arbitrary agency regulation controls)) but are reviewed under the Skidmore standard (i.e. regulations have the power to persuade, as they are the official IRS interpretation, but do not control); North Dakota, 255 F.3d at 604 n. 6 (“[Rjevenue rulings do not have the force of law, [but] they are entitled to respectful consideration ....”) (internal quotation omitted).
The parties cite four Revenue Rulings— 58-301, 74-252, 75-44, and 2004-110 — as relevant to this case. The courts in North Dakota and Pittsburgh relied on three of these rulings — 58-301, 74-252, and 75-44. Although Ruling 2004-110 generally supports the government’s position, plaintiffs contend that it was promulgated in anticipation of litigation.[7]
In Revenue Ruling 58-301, the IRS determined that FICA taxes were not owed on a lump-sum payment received by an employee as consideration for the early termination of his five-year employment contract. 1958-1 C.B. 23, 1958 WL 10630. The IRS further determined that the employee received the lump-sum payment in exchange for the relinquishment of his contractual rights (i.e., to be employed for the full five years) and therefore not subject to FICA taxation. Id.
In contrast, however, the IRS concluded in Revenue Ruling 74-252, that payments made to an employee to unilaterally terminate his three-year employment contract were taxable as FICA wages because the contract gave the employer the right to terminate the contract at any time, so long as the employer paid the employee an additional six-month salary, which it did. 1974-1 C.B. 287, 1974 WL 34867. The Ruling distinguished 58-301 by noting that, in 74-252, the employee received payment pursuant to an already-present employment contract. Id.
In the instant case, I would hold that the ESP payments are most like the payments in Ruling 58-301, as they did not arise from the employment contract. Indeed, the ESP payments are ultimately distinguishable from either Ruling, as they were made in exchange for an entirely separate statutory right.
Finally, in the case that the majority finds most persuasive, Revenue Ruling 75-44 held that a lump-sum payment given to a railroad employee to buy-out his seniority rights earned pursuant to a general employment contract was taxable under the Railroad Retirement Tax Act (FICA’s counterpart for railroad employees). 1975 C.B. 15,1975 WL 34658. After noting that the employee was only an at-will employee, but received higher pay as a result of his seniority rights, the IRS concluded that this remuneration compensated the employee exclusively for past services earned. Id. However, Ruling 75-44 is distinguishable from the present case because plaintiffs’ rights in this case arise not from their employment contract, but rather from state law. Indeed, because of the rights bestowed by Mich. Comp. Laws § 38.101, plaintiffs possessed an alternative source of consideration, and, accordingly, the school districts had an alternative basis for providing ESP payments.
VI.
For the foregoing reasons, with the exception of William Rase, I would hold that *205 the ESP payments to the Michigan teachers do not constitute “wages” for purposes of FICA. Accordingly, I would affirm the grant of summary judgment in favor of plaintiffs in Klender and reverse the grant of summary judgment in favor of the United States in Appoloni.

 Felix Frankfurter, Some Reflections on the Reading of Statutes, 47 Colum. L.Rev. 527, 538 (1947).

 Oliver Wendell Holmes, Collected Legal Papers 207 (1920), quoted in Schwegmann Bros. v. Calvert Distillers Corp., 341 U.S. 384, 397, 71 S.Ct. 745, 95 L.Ed. 1035 (1951) (Jackson, J., concurring).

. See also Cent. Ill. Pub. Serv. Co. v. United States, 435 U.S. 21, 98 S.Ct. 917, 55 L.Ed.2d 82 (1978) (holding reimbursements to employees for expenses did not qualify as "wages”).

. The government repeats this discredited argument in its appellate brief in Klender.

. In 1983, Congress added the following additional language to 26 U.S.C. § 3121(a):
[Njothing in the regulations prescribed for purposes of chapter 24 (relating to income tax withholding) which provides an exclusion from "wages" as used in such chapter shall be construed to require a similar exclusion from "wages” in the regulations prescribed for purposes of this chapter.
Social Security Amendments of 1938, Pub.L. No. 98-21, § 327(b)(1) 97 Stat. 65 (1983).

. Were we to employ a result-oriented rule of statutory construction, any doubt should be resolved in favor of the taxpayer, not the government tax collector. See Hassett v. Welch, 303 U.S. 303, 314, 58 S.Ct. 559, 82 L.Ed. 858 (1938) ("[I]f doubt exists as to the construction of a taxing statute, the doubt should be resolved in favor of the taxpayer ....”).

. In Michigan, plaintiff may sue in tort for loss of earning capacity, rather than loss of actual wages. Prince v. Lott, 369 Mich. 606, 120 N.W.2d 780 (Mich.1963); Michigan Supreme Court Committee on Model Civil Jury Instructions, Michigan Standard Civil Jury Instruction, 50.06 (2006), http://courts.mi.gov /mcji/MCJI.htm. Damages recovered for loss of earning capacity are not subject to FICA taxation. Dotson v. United States, 87 F.3d 682 (5th Cir.1996).

. Although the majority attempts to distinguish the facts, particularly on the issue of tenure, the salient fact — a statutorily protected due process consideration — renders the eases materially indistinguishable. This is evident from the Eighth Circuit's distinction between tenured and non-tenured employees who had the same number of years of service.

. Plaintiffs note that Ruling 2004-110 specifically states that it would not apply to payments made by an employer prior to January 12, 2005. Plaintiffs’ observation is well-taken; even if the Court were persuaded by this Ruling, a large portion of plaintiffs' payments would remain unaffected because the ESP payments predate its applicability. (Rev. Rul. 2004-110, 2004-50 I.R.B. 960, 962).